IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | **Filed Under Seal** |
| 10263 FAITH DRIVE, APARTMENT NO. 2<br>KING GEORGE COUNTY, VIRGINIA 22485 | Case No.   3:23sw109 |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Stephen C. Lamar, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Task Force Officer with the Federal Bureau of Investigation and have been

so assigned since April 7, 2021.  I am employed by the Fredericksburg Police Department, where

I serve as a Narcotics Investigator.  Prior to that assignment, I was assigned to the Patrol

Division.  I have received basic training in drug investigation techniques such as drug

identification, constitutional law, Virginia law and criminal behavior at the Rappahannock

Regional Criminal Justice Academy located in Fredericksburg, Virginia. I have received

extensive training in criminal interdiction, hotel interdiction, drug identification, social media

and open-source investigation through Street Cop Training. I have received training from the

National Association of Drug Diversion Investigators (NADDI), and I am a certified drug

diversion investigator. I am a graduate of Top Gun XXVIII where I received training in the

investigation and prosecution of drug cases in the Commonwealth of Virginia. I am a recognized

drug expert in both the General District and Circuit Courts of the City of Fredericksburg.

2.      I have participated in the preparation and execution of numerous arrests and

search warrants for criminal offenses involving the possession and trafficking of illegal

narcotics. I am familiar with the methods narcotics traffickers commonly use to conduct their illegal activities, including communication methods, the use of cellular communication devices and applications, the use of vehicles equipped with secret compartments, and the way narcotics transactions are typically accomplished. I am familiar with counter-surveillance methods narcotics traffickers use while engaged in illegal activities. I have participated in numerous investigations that require surveillance, to include investigations in conjunction with the interception of electronic communications. Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques, including oral, and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover operations, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

3.      Through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and use of coded words to disguise conversations about their narcotics activities, especially when they are communicating by telephone.  I have had the opportunity to interview individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most or all their transactions in cash to avoid leaving a paper trail of their narcotics purchases, sales, and proceeds.  I have also learned that narcotics traffickers at the higher levels of the trafficking hierarchy tend to avoid or minimize their possession of narcotics

to avoid apprehension by law enforcement and that these higher-level narcotics traffickers tend to operate through intermediaries or "runners" to further minimize their own exposure.  In addition, I have learned the measures that narcotics traffickers use to avoid law enforcement surveillance and investigations, such as the development and use of aliases; the use of cellular telephones and other communication devices; the use of other individuals' names for telephones, assets, vehicles, houses, bank accounts, utilities, etc., in order to avoid the use of their own names being associated with these items and assets; and the use of counter-surveillance driving techniques to detect law enforcement surveillance and avoid being followed by law enforcement.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED

5.      The place to be searched is the residence located at 10263 Faith Drive, Apartment No. 2, King George County, Virginia 22485 ("SUBJECT RESIDENCE"), which is more fully described in Attachment A, incorporated by reference herein.  This affidavit provides probable cause to believe that the items of evidence listed in Attachment B, incorporated by reference herein, which constitute evidence, fruits and instrumentalities of illegal drug trafficking and a conspiracy to do the same in violation of Title 21, United States Code, Sections 841, and 846, will be found at the SUBJECT RESIDENCE.

## **PROBABLE CAUSE**

6.      Starting before July 2022, agents have been investigating a drug trafficking organization (DTO) operating in and around the Fredericksburg, Virginia area, including the City of Fredericksburg, Spotsylvania County, Stafford County and King George County. Agents identified Omar DIXON as one of the leaders of the DTO in this area. Through this investigation, agents have determined that the DTO is responsible for distributing cocaine hydrochloride, cocaine base, fentanyl, heroin, synthetic cathinones and other illegal controlled substances. During the course of this investigation, agents utilized Court authorized wire and electronic intercepts from March 29, 2023, through April 27, 2023, and May 2, 2023, through May 30, 2023 (collectively, "the Wire") on DIXON's telephone, capturing drug trafficking related calls and text messages between DIXON and other members and associates of the DIXON DTO.  Based on information obtained from the Wire, agents have surveilled members of the DTO meeting with DIXON and have been able to track DIXON's movements and have observed DIXON as he has engaged in drug trafficking activities.  Based on information obtained from the Wire, agents arrested individuals who met with DIXON to purchase drugs and recovered controlled substances from those individuals.

7.      During this investigation, agents conducted numerous controlled purchases of illegal controlled substances from DIXON with the assistance of a confidential human source of information (CS-1) and have observed DIXON engaging in what appears to have been hand-to-hand drug transactions with numerous individuals, including two of which were arrested and found to be in possession of controlled substances following hand-to-hand transactions with DIXON.

8.      Through intercepted calls on the Wire, agents identified an unindicted coconspirator ("UC-3")[1] as a close associate of DIXON. On March 30, 2023, after DIXON communicated with UC-3 about "getting his medicine," agents observed DIXON and UC-3 meet in King George with a third-party female, then travel to Fredericksburg. Agents followed DIXON and UC-3 to an apartment complex in the City of Fredericksburg. Agents were unable to observe which apartment DIXON and UC-3 went to, but believe they were there to conduct a drug transaction because the purpose of the trip was to get DIXON's "medicine," which agents believe was code for PCP. DIXON has a long history of PCP use and was convicted in 2002 of distribution of PCP. Following this trip, agents observed UC-3 travel to the area of the SUBJECT RESIDENCE. On numerous occasions when DIXON travels from Maryland to Virginia, DIXON either goes to the SUBJECT RESIDENCE before, after or both before and after controlled purchases with CS-1 or other suspected drug transactions. On intercepted calls on the Wire, UC-3 refers to the SUBJECT RESIDENCE as UC-3's residence, and other DTO members refer to the SUBJECT RESIDENCE as UC-3's residence.

9.      UC-3 has a history of drug trafficking. Since 2002, UC-3 has been convicted of 19 felonies. In September 2005, UC-3 was convicted of two counts of the sale of drugs on, near a school property, or library, and two counts of distribution of cocaine in King George County and sentenced to 30 years imprisonment with 28 years and 4 months suspended. In March of 2018, UC-3 was convicted of possession with intent to distribute a Schedule I/II controlled substance in Stafford County and sentenced to 10 years of imprisonment with 8 years and 3 months

---

[1] During the course of this investigation, agents identified at least 11 additional coconspirators who have not yet been indicted. Each coconspirator has been assigned a specific "UC" number to use in lieu of the unindicted conspirator's name. Accordingly, the UC numbers used in this affidavit will not necessarily be sequential.

suspended. In July 2018, UC-3 was convicted of driving under the influence (DUI) and felony

eluding and was sentenced to 5 years with 4 years suspended.

10.     On April 1, 2023, agents intercepted a call on the Wire from UC-3. During this

call, UC-3 told DIXON to come to his house. DIXON told UC-3 that he had that "other thing

with him," but he needed UC-3 to give him the money first. DIXON told UC-3 that he was

"coming now." Agents attempted to located DIXON, but based off calls intercepted on the Wire,

he was transported from Maryland to Virginia by a different unindicted coconspirator ("UC-9").

According to DIXON's GPS Location Data on DIXON's cellular telephone, DIXON was in the

area of the SUBJECT RESIDENCE in King George, Virginia.

11.     On April 6, 2023, agents intercepted a call between DIXON and Leonard SMITH

during which DIXON asked SMITH where he was.  DIXON told SMITH that he was at

SMITH's house.  Agents observed DIXON arrive at SMITH'S residence, located at 1 Bentley

Court, Fredericksburg, Virginia.  Shortly thereafter, agents saw DIXON leave the neighborhood

and travel across the street to a convenience store.  There, agents saw DIXON and SMITH get

out of DIXON's vehicle and go into the convenience store.  Upon exiting the store, SMITH

entered the driver's side of DIXON's vehicle and DIXON entered the front passenger side.

Agents continued surveillance of the two who travelled to 108 Wellington Lakes Drive,

Fredericksburg, Virginia.  Agents had previously observed DIXON on March 30, 2023, go to

this location with UC-3 after DIXON told UC-3 that DIXON needed his medicine.  I know that

DIXON has a history of PCP use based on information developed during a prior 2002 federal

prosecution of DIXON, that included a conviction for possession with intent to distribute PCP.

Discussions intercepted on the Wire further support the belief that DIXON continues to use PCP,

including DIXON referring to "juice," "OJ," and "water," all of which are common terms used to

describe liquid PCP, in the context of obtaining the item from an individual known to reside at 108 Wellington Lakes Drive, Fredericksburg, Virginia.

12.     Shortly after SMITH and DIXON left 108 Wellington Lakes Drive, agents intercepted a call from UC-3 asking DIXON if SMITH and DIXON handled "their business." DIXON affirmed that he did and then told UC-3 that he, referring to DIXON, had to make some money while he was down here, referring to the Fredericksburg area.  Agents then observed SMITH and DIXON travel to 1 Bentley Court, then to the stash house located at 1604 Airport Avenue, Fredericksburg, Virginia, located in the Mayfield subdivision.  After staying at the stash house for approximately 10 minutes, SMITH and DIXON left the stash house and made a number of stops in and around the Fredericksburg area.  Among the stops they made, was 356 Riverside Manor Boulevard, Fredericksburg, Virginia, which is the residence of DIXON's grown stepson, who is also a member of the DTO ("UC-6").  After staying there for approximately 10 minutes, DIXON and SMITH travelled to 11604 Silverleaf Lane, Spotsylvania, Virginia, the residence of another DTO member ("UC-7").  UC-7 arrived at the residence and met with DIXON for approximately 7 minutes.  DIXON and SMITH left and travelled to the SUBJECT RESIDENCE in King George, Virginia.

13.     On April 16, 2023, agents intercepted a call between Ricardo MORTON, an indicted coconspirator, and DIXON, during which MORTON told DIXON to come on down and DIXON indicated he was on his way.  Agents observed DIXON travel to the area of 1200 Forest Village, MORTON's residence, but did not see DIXON meet with anyone.  After approximately 20 minutes, DIXON left the area.  Agents intercepted calls between DIXON and Kelsey Dean MONROE, Jr., another indicted coconspirator, during which the two agreed to meet.  Agents followed DIXON and observed the meet between DIXON and MONROE.  Subsequently, on

April 26, 2023, MONROE was arrested following a similar meeting with DIXON and was found

to be in possession of approximately 1 kilogram of a synthetic cathinone, specifically N, N-

dimethylpentylone, a Schedule I controlled substance, commonly referred to as "Boot."   After

meeting with MONROE, DIXON travelled to 1004 Myrick Street Fredericksburg, Virginia,

which is located in the Mayfield subdivision. Agents observed DIXON enter 1004 Myrick Street

which is where another unindicted coconspirator ("UC-4") resides. After DIXON left the

Mayfield subdivision, agents followed DIXON to the area of the SUBJECT RESIDENCE in

King George, Virginia.

14.     On April 18, 2023, agents intercepted a call on the Wire between DIXON and

UC-3, arranging to meet at a Dollar General which is located at the entrance of UC-3's

neighborhood. Agents observed DIXON park at the Dollar General where agents believe

DIXON picked up UC-3 who arrived in a navy-blue Hyundai that was observed arriving at the

Dollar General that had travelled from the area of the SUBJECT RESIDENCE. Agents followed

DIXON to the Fredericksburg area where DIXON was observed arriving at 436 Rann Court,

Fredericksburg, Virginia. Agents intercepted a call on the Wire between DIXON and Walter

BROWN, an indicted coconspirator, during which DIXON told BROWN that he was at his door.

Agents believed DIXON was meeting with BROWN for a suspected drug transaction or to

collect payment for a prior drug transaction.  After leaving BROWN's residence, agents

followed DIXON to Carl's Frozen Custard located in Fredericksburg, Virginia. Agents observed

UC-3 standing outside of the driver's side of DIXON's vehicle, confirming that DIXON had

picked up UC-3 up at the Dollar General prior to traveling to Fredericksburg.

15.     On April 19, 2023, at the direction of agents, CS-1 contacted DIXON to arrange a

controlled purchase to occur the following day. Agents set up surveillance on DIXON, who had

just started working at the Car Vault, a car dealership in Maryland, where DIXON was detailing

cars. Agents anticipated DIXON would meet with his source of supply to be prepared for the

deal with CI-1 the next day. While surveilling DIXON, agents observed an individual that

agents had previously identified as DIXON's source of supply ("UNINDICTED SOS") arrive at

the Car Vault driving a white Buick Enclave registered to the UNINDICTED SOS.

UNINDICTED SOS parked his vehicle and walked into the dealership. A few moments later he

walked back out and to the front passenger door of DIXON's white Porsche Cayenne GTS.

UNINDICTED SOS opened the door and removed a single strapped Gucci satchel-style bag.

UNINDICTED SOS walked to his vehicle with the bag, opened the door of his vehicle, made

movements within the vehicle and walked back to DIXON's vehicle. UNINDICTED SOS was

carrying the single strapped Gucci satchel-style bag, which was noticeably fuller than it was

when UNINDICTED SOS took it out of DIXON's vehicle. UNINDICTED SOS placed the

Gucci satchel-style bag back into DIXON's vehicle and re-entered the car dealership. Based on

agent observations as well as previous interactions with UNINDICTED SOS on October 19,

2022, and April 5, 2023, I believe UNINDICTED SOS used DIXON's Gucci bag to transport

drugs from his vehicle to DIXON's vehicle.

   16.    After UNINDICTED SOS went into the dealership after placing DIXON's Gucci

bag back into DIXON's vehicle, agents intercepted a call from a Solar Company to DIXON'S

phone that DIXON answered but did not respond to the caller, indicating that DIXON was

unaware of the open line. DIXON is overheard talking to someone at the dealership, likely the

UNINDICTED SOS, about "two keys" and says that he wasn't paying 17 and that he said 15.

Based on my training and experience, "keys" is short for kilograms. Also, "17" and "15" are

short for $17,000 and $15,000.

17.     On April 20, 2023, DIXON traveled from the area of his home in Waldorf, Maryland to Virginia. Agents intercepted a call on the Wire between DIXON and UC-3 arranging to meet at UC-3's apartment. Agents observed DIXON travel to the area of the SUBJECT RESIDENCE shortly after intercepting the call on the Wire. Approximately 5 minutes later, DIXON departed from the area of the SUBJECT RESIDENCE and traveled to the Fredericksburg area. Agents intercepted a call on the Wire between DIXON and Walter BROWN arranging to meet at the "spot." Agents observed DIXON meet with BROWN at a CVS located in Fredericksburg, Virginia. Following this meeting, troopers with the Virginia State Police (VSP) Counterterrorism and Criminal Interdiction Team (CCI) conducted a traffic stop of BROWN's vehicle. Trooper Todd and his K-9 partner "Sig" conducted a free air sniff of BROWN's vehicle which indicated a positive alert of the odor of narcotics in or around his vehicle. A subsequent search of the vehicle produced the seizure of approximately 175 grams of crack cocaine. Agents suspect that UC-3 is supplied cocaine hydrochloride from DIXON and that UC-3 converts it to cocaine base (crack cocaine).  After BROWN was stopped, agents utilized CS-1 to make a controlled purchase of 9 ounces of cocaine hydrochloride from DIXON. Agents believe that DIXON went to the SUBJECT RESIDENCE that day before meeting BROWN and CS-1, to meet UC-3 to supply cocaine to UC-3 and pickup cocaine base.

18.     After completing the controlled purchase with the reliable cooperator, agents followed DIXON back to the area of the SUBJECT RESIDENCE in King George, Virginia. After approximately 20 minutes, DIXON was observed leaving the area of the SUBJECT RESIDENCE after agents intercepted a call on the Wire between DIXON and another DTO member ("UC-5"). DIXON and UC-5 arranged to meet at UC-5's house. Agents observed DIXON travel to 10474 Walkers Lane in King George, Virginia. Agents observed DIXON meet

with UC-5 in the driveway of UC-5's residence. Less than 5 minutes later, DIXON was observed leaving and traveled back to his residence in Maryland. Based on my training and experience, this interaction was consistent with DIXON's drug transactions.

19.     On April 22, 2023, agents intercepted a call on the Wire between DIXON and UC-3. During this call, DIXON told UC-3 that he was coming to get the "rest of that" to which UC-3 replied, "I got rid of it last night." DIXON asked UC-3, "you ain't got nothing?" UC-3 replied, "no" and DIXON told him that he was on his way there. Shortly after that call, agents intercepted a call on the Wire between DIXON and MORTON, during which MORTON told DIXON that as soon as DIXON picked up "the other junk" people started calling MORTON. DIXON told MORTON that the stuff was gone now and DIXON said he was going to get some more.  MORTON said he was not going to deal it.  DIXON told MORTON that he was ready to get some more but was waiting on MORTON.  MORTON told DIXON that he had something for him.  DIXON told MORTON that he would be there in a few hours and told MORTON that he had something for him the "other day" but that he sold it.  DIXON told MORTON that as soon as DIXON saw MORTON, he sold "it" to "Kendall."  Agents intercepted calls between DIXON and an individual on April 20, 2023, arranging what agents believe was a purchase of cocaine.  Pursuant to those calls, agents observed DIXON meet with that individual in a manner consistent with a drug transaction.  DIXON told MORTON he was ready to go back up but needed to round up first.  I believe that DIXON was telling MORTON that he was ready to go back to meet his supplier to obtain more drugs but had to pick up the money owed to him before he could do that.

20.     Later that night, agents observed DIXON arrive at the SUBJECT RESIDENCE in King George, Virginia. Shortly after, agents observed DIXON's vehicle leave the area of the

SUBJECT RESIDENCE occupied by DIXON and another male, later confirmed to be UC-3.

Agents observed DIXON travel to 108 Wellington Lakes Drive Fredericksburg, Virginia. Agents

observed UC-3 exit from the driver seat of DIXON's vehicle and meet with a male, later

identified, in the breezeway of building 108. During that meeting, agents observed and recorded

the man and UC-3 conduct what appeared to be a hand-to-hand transaction. UC-3 then returned

to DIXON's vehicle, and they immediately exited the apartment complex. Based on my training

and experience, people who buy and sell narcotics often use the appearance of a handshake to

exchange money for narcotics. After meeting with the man, agents intercepted a call on the Wire

between DIXON and MORTON arranging to meet at a Valero gas station in Fredericksburg,

Virginia. Agents observed DIXON and MORTON meet at the prearranged location for

approximately 20 minutes.  Afterward, DIXON got in his vehicle and left, GPS monitoring

showed DIXON and UC-3 traveled back to the area of the SUBJECT RESIDENCE. Agents

followed MORTON, who drove across town to a gas station where MORTON pulled into a

parking spot for a moment and then left without ever leaving his vehicle or meeting anyone.

Agents suspect this was a countersurveillance effort following the suspected drug transaction

with DIXON.

21.     On May 5, 2023, agents intercepted a call on the Wire between DIXON and UC-3

during which DIXON and UC-3 both said they need to see one another. UC-3 asked DIXON if

he had the "other thing." DIXON told UC-3, that he needed to come over there (meaning

Fredericksburg) and grab some cash. DIXON told UC-3 he was going to come through and then

come back and that he would probably see UC-3 the following day.  UC-3 asked DIXON if he

was going to come see him first. DIXON said he was going to "swing up" and make his rounds

and then "swing back up" to see "my man" then he would come see UC-3. UC-3 told DIXON

that he was confused, and DIXON told UC-3 that he does not need to know all that, he will see him later, but that DIXON was going to come see UC-3 "right now" so DIXON could have something to keep him up. UC-3 told DIXON, "Oh, then you gonna see me tomorrow for the other thing." DIXON said, yeah but he had to come down there and make his rounds and see his people to get his money. Later that night, agents observed DIXON travel to UC-3's apartment complex. Aided by aerial surveillance, UC-3 was observed walking from the area of his apartment complex and getting into the passenger side of DIXON's vehicle. Agents suspect that DIXON and UC-3 were smoking PCP based on the earlier intercepted call where DIXON told UC-3 he was going to come see him to get something to keep him awake. Approximately 30 minutes later, UC-3 was observed exiting DIXON's vehicle and walk back to his apartment. Aerial surveillance observed UC-3 enter the back porch entrance of the SUBJECT RESIDENCE.

22.     On May 6, 2023, agents intercepted a call on the Wire between DIXON and UC-3 during which DIXON told UC-3 that his "man" had held him up all day. Agents intercepted a call on the Wire earlier that day between DIXON and his source of supply ("UNINDICTED SOS") during which the UNINDICTED SOS told DIXON that he was at his house in Maryland. DIXON told UC-3 he could come see him now or wait until tomorrow. UC-3 told DIXON that it was up to DIXON. DIXON asked UC-3 what the deal was with the "OJ," and UC-3 told DIXON he was going to call "him" now. Approximately 1 hour later, agents intercepted a call on the Wire between DIXON and UC-3 during which they agreed to meet the following day.

23.     On May 7, 2023, agents intercepted a call on the Wire between DIXON and UC-3 during which DIXON asked UC-3 where he was. UC-3 told DIXON that he was "at the house." DIXON asked UC-3 if he wanted DIXON to come inside and UC-3 told him to park and walk around through the cut and come inside through the back way. Agents believe UC-3 was

referring to the back porch entrance of the SUBJECT RESIDENCE that aerial surveillance had observed UC-3 enter during surveillance on May 5, 2023. After approximately 7 minutes, DIXON left the area of the SUBJECT RESIDENCE and went to a nearby gas station. Agents intercepted a call over the Wire between DIXON and another unindicted coconspirator ("UC-9"). UC-9 agreed to meet DIXON at the gas station. A short time later agents observed the UC-9 meet with DIXON at the gas station and conduct what appeared to be a hand-to-hand transaction. After that transaction, DIXON left the gas station and met MORTON at DIXON's Virginia residence, located at 209 Clint Lane, Stafford, Virginia. DIXON met with MORTON for approximately 15 minutes, and then travelled to the stash house located on Airport Avenue in the Mayfield subdivision. While at the stash house, agents intercepted calls on the Wire between DIXON and Alphonso JONES, an indicted coconspirator. JONES then met DIXON in front of the stash house on Airport Avenue. Agents then intercepted calls between DIXON and another DTO member, during which DIXON agreed to travel to that DTO member's residence. Agents observed DIXON travel to and enter the DTO member's residence, which is also located in the Mayfield subdivision. DIXON left approximately 10 minutes later and travelled to the People's Mart. When DIXON travelled to the People's Mart, agents intercepted a call between DIXON and an unknown individual, during which DIXON told the individual that DIXON needed to see him. The individual said he needed to see DIXON too. While DIXON was waiting on this individual, agents observed DIXON counting a large sum of money that DIXON had pulled out of a Gucci satchel-style bag. Approximately 10 minutes after the call, the unknown male met with DIXON at the People's Mart. Agents observed the individual get in the passenger seat of DIXON's vehicle where they met for 10 minutes. After the individual left, DIXON called Leonard SMITH, an indicted coconspirator, and asked SMITH where the person with the "juice"

was.  SMITH told DIXON that he did not know, and that UC-3 had not heard from him either.

DIXON told SMITH to call him.  SMITH told DIXON that he was not answering the phone but

that he was not "right yet".  SMITH told DIXON that he had a girl that had some bottles, but

DIXON said he wanted "sticks."  DIXON and SMITH discussed an individual with poor quality

drugs, that clearly contained additives.  DIXON told SMITH that he had been smoking the stuff

all his life and that he was not interested in the poor-quality drugs.  Based on my training and

experience I believe that DIXON and SMITH were talking about PCP.  PCP is often in a liquid

form, varying in color from clear to an orange color.  Agents followed DIXON as he picked up

SMITH and followed DIXON and SMITH as they travelled to Candlewood Suites in

Spotsylvania County.  Based on the intercepted calls, agents believe that SMITH and DIXON

were meeting with the female named "Alicia" who had bottles of PCP.

24.     After SMITH and DIXON left Candlewood Suites, agents intercepted a series of

calls between DIXON and UC-3 who asked if DIXON and SMITH had already talked to the

guy.  They said no, they already talked to Alicia.  UC-3 told them that if they "miss" not to call

him back because he had already talked to the guy.  UC-3 told DIXON and SMITH that the guy

was ready.  DIXON told UC-3 that they were coming now and to tell the guy that they would be

there in 10 minutes.  During that conversation, UC-3 asked DIXON and SMITH to pick him up.

Agents followed DIXON and SMITH as they pulled into the apartment complex where the PCP

source was located.  Approximately 8 minutes later, agents saw SMITH and DIXON leave the

apartment complex and travel to Townsend Apartments, where the UC-3 met them, and then

agents followed SMITH, DIXON and UC-3 back to the area of the SUBJECT RESIDENCE.

25.     On May 9, 2023, agents intercepted a call on the Wire between DIXON and UC-3

during which UC-3 told DIXON that he would be "cut off" in the next day or two.  DIXON told

UC-3 that he was going to have to come down there and get UC-3 right. Based on my training and experience, I believe that UC-3 was telling DIXON that he was going to run out of cocaine that he was just supplied with two days prior in the next couple of days and DIXON told UC-3 that he would come back to King George to resupply UC-3 with more cocaine. Later that night, agents intercepted a call on the Wire during which DIXON told UC-3 that he was at his door. UC-3 told DIXON to come around the back side. According to GPS monitoring, DIXON was in the area of the SUBJECT RESIDENCE at the time that call was intercepted.

26.     On May 16, 2023, agents intercepted a call on the Wire during which UC-3 told DIXON, that he would be ready for him by Thursday. Based on my training and experience, I believe UC-3 was telling DIXON that he would be ready for another resupply of cocaine by Thursday after last being supplied on May 9. The next day, agents intercepted several calls on the Wire between DIXON and UC-3. During the first call, DIXON asked UC-3 if he had any "OJ" and UC-3 said that he didn't. DIXON asked if "he" had any, and UC-3 said that he probably did and that he would call "him." During the second call, DIXON and UC-3 arranged to meet at 5:30 p.m. During the last call, DIXON told UC-3 that he was outside. According to GPS monitoring, DIXON was in the area of the SUBJECT RESIDENCE when he called UC-3 and told him that he was outside.

27.     On May 18, 2023, agents conducted a surveillance operation at the SUBJECT RESIDENCE. During this operation, aerial surveillance observed a vehicle parked outside of the SUBJECT RESIDENCE.  The vehicle is registered to UC-3's brother, who is also an unindicted coconspirator ("UC-2,") and is the lease holder of the SUBJECT RESIDENCE.  During the surveillance, agents observed UC-2 seated in his vehicle, making numerous hand-to-hand transactions in the parking lot in front of SUBJECT RESIDENCE.

28.     Historic data retrieved from DIXON's iCloud account pursuant to Court order shows that DIXON and UC-2 communicated regularly via iMessage, which agents were unable to intercept on the Wire.  Agents requested all historical data stored on DIXON's iCloud through April 21, 2023. Included in the data agents received were text messages from January of 2021 to October of 2022 when DIXON stopped storing his text message to the iCloud. During a text conversation in March of 2021, UC-2 told DIXON that he had another young individual interested in purchasing a brick (meaning kilogram) of "molly." DIXON told UC-2 that he would sell the kilogram of "molly" for $5,300. Based on my training and experience, I know that "molly" in the drug culture is a term used when referring to synthetic cathinones, which are a Schedule I controlled substance. In September of 2022, UC-2 told DIXON that he sold a ball (meaning 3.5 grams) of the soft (meaning cocaine hydrochloride) to another individual that said it was not the same and asked DIXON what was in it. DIXON told UC-2 that the cocaine was "A-1" (meaning good quality) and to give it back to the individual.  These historic iMessages establish a long-term drug relationship between DIXON and UC-2, who is the lease holder and one of the occupants of the SUBJECT RESIDENCE.  The other occupant of the SUBJECT RESIDENCE, UC-3, also has a long-term drug relationship with DIXON.

29.     On May 21, 2023, agents intercepted a call on the Wire between DIXON and UC-3 during which UC-3 told DIXON that he would probably be ready for him that night. Four days later, DIXON traveled from Maryland to Virginia where he met with several other DTO members. During a call with MORTON, DIXON told MORTON that he was going to like what he got and that he had to go through another source of supply because his "man" was getting sloppy. Based on my training and experience and my knowledge of the DIXON DTO, I believe that DIXON had to obtain controlled substances from a different source of supply because his

regular source of supply was not able to supply the requested drugs.  After meeting with two

members of the DTO, agents observed DIXON travel to the SUBJECT RESIDENCE. A local

law enforcement officer, familiar with the area and known to frequently patrol the apartment

complex, conducted a spot check of the SUBJECT RESIDENCE. Upon checking the area,

DIXON's vehicle was observed parked in front of the SUBJECT RESIDENCE.  The officer

subsequently observed DIXON sitting on the back porch of the SUBJECT RESIDENCE with a

person who appeared to be UC-3. Soon after meeting with UC-3, DIXON traveled to

Fredericksburg and met with another DTO member.

30.     Recent pen register data shows that UC-3 continues to have regular contact with DIXON,

the most recent of which was June 21, 2023.  Recent pen register data shows that UC-2 continues to have

regular contact with DIXON, as well, the most recent of which was June 3, 2023.  GPS Location Data

from DIXON's phone shows that DIXON continues to be in the vicinity of the SUBJECT RESIDENCE,

including as recently as June 21, 2023.

31.     Based on my training and experience, and on information provided to me by other

experienced law enforcement agents involved in this investigation, I know that:

   a.   Narcotics traffickers often maintain on hand large amounts of U.S. currency in

      order to maintain and finance their ongoing narcotics business, which are

      typically proceeds of narcotics trafficking.

   b.  Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline

      tickets, money orders, cashier check receipts, and other papers relating to the

      transportation, ordering, sale, and distribution of controlled substances, even

      though such documents may be in code.

c.   Narcotics traffickers often "front" narcotics (provide controlled substances on consignment) to their clients and maintain records to account for the narcotics fronted and the monies owed for those illegal narcotics.  These books, records, receipts, notes, ledgers, and other documents are commonly maintained in hardcopy form and sometimes in digital form such as on computers, or other electronic data storage devices, including cellular phones, where narcotics traffickers have ready access to them, including but not limited to residences, offices, vehicles, and storage places.

d.   It is common for narcotics dealers to keep proceeds of narcotics sales and/or records of narcotics transactions, narcotics sources, and narcotics customers in secure locations within their residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities.

e.   Narcotics traffickers conceal caches of narcotics, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of narcotics transactions, and evidence of financial transactions related to obtaining, transferring, or spending large sums of money made from narcotics trafficking activities in their residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, buried in yards and in remote sections of their real property, and/or vehicles, and these types of records are often maintained in hardcopy form and also maintained on computers or other electronic data storage devices, including cellular phones.

f.   Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the narcotics trafficking organization, these items are typically written in code, and these types of records are often maintained in hardcopy form and also maintained on computers or other electronic data storage devices, including cellular phones.

g.   Narcotics traffickers frequently take or cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and their product, and these traffickers usually maintain such photographs and/or videos, in their residences, offices, cellular telephones, or other places or devices under their control.

h.   Narcotics traffickers keep paraphernalia for packaging, cutting, weighing, manufacturing, and distributing controlled substances, which includes, but is not limited to, money counters, scales, plastic wrap, plastic bags, vacuum sealers, hydraulic presses and press plates, and cutting agents, as well as items designed to mask the odor of illegal narcotics such as soap powder, dryer sheets, ammonia, wood shavings, heat sealers, and plastic wrapping in their residences and stash houses where they can safely prepare their narcotics for resale.

i.   When narcotics dealers collect proceeds for the sale of illegal narcotics, they often attempt to legitimize or "launder" these profits through sources, including but not limited to, businesses, foreign and domestic banks and their attendant services, casinos, cashier's checks, money orders, wire transfers, and bank drafts and

narcotics dealers keep records and receipts of these transactions in safe places such as their residences, safe houses and stash houses.

j.   Narcotics traffickers commonly utilize telephones, computers, tablets, gaming systems, and other electronic devices as a means of communication to conduct their illegal narcotics trafficking and these devices often store contact phone numbers, numbers dialed and numbers from calls received as well as other stored electronic communications such as text messages, direct messages, social media posts and messages, communication apps, email and other messaging programs.

k.   Narcotics traffickers often purchase vehicles, businesses, and residences with the proceeds from their drug transactions, and place these assets in the names of other trusted individuals in order to avoid discovery by law enforcement and keep records of these transactions in their residences, safe houses, and stash houses.

l.   The courts have recognized that unexplained wealth is probative evidence of crime motivated by greed, in particular, illegal trafficking in controlled substances.

m.   Individuals and businesses involved in the illegal distribution of controlled substances often use computer equipment to document and track their business affairs, including their illicit sales and disposition of the proceeds of their sales and communications with associates concerning their distribution of controlled substances.

n.   There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents

reflecting purchases of assets, personal calendars, telephone and address books and ledgers, check books, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and cellular phone and data bills, keys to safe deposit boxes, hardware and software computers), but have significance and relevance when considered in light of other evidence.  The evidence may be highly valuable to the offender, and at the same time have great evidentiary value, such as valuable investments (e.g. art, jewelry, precious metals and stones, real estate, securities), large sums of currency, drug or money laundering ledgers and owe sheets, safes, customer lists, communications equipment, vehicles, airplanes, vessels, computers, tablets, smartphones, counter surveillance equipment (including doorbell cameras and wildlife cameras set up in remote areas), scales, processing equipment and packaging materials.

o.  In my experience, illegal narcotics trafficking is a continuing activity that spans months and even years.  Illegal narcotics traffickers will repeatedly obtain or manufacture and then distribute controlled substances on a regular basis, such as any distributor of a legitimate commodity would purchase stock, and similarly, such narcotics traffickers will have an "inventory" which will fluctuate in size depending upon the supply and demand for the product.  Certain types of drug paraphernalia, such as scales for use in weighing amounts of narcotics at the time of purchase, plastic wrap and plastic bags for packaging narcotics for distribution and/or transportation, hydraulic presses and press plates, used for repackaging diluted or "cut" narcotics, and money counters used for counting large quantities

of U.S. currency, are often kept by a trafficker on a continuous basis for use whenever needed.

p.  Narcotics traffickers keep records evidencing their illegal activities for months or years beyond the time during which they actually possess illegal narcotics, in order to maintain contact with their criminal co-conspirators and associates for future transactions, and so that they have records of prior transactions for which, for example, they might still be owed money, or might owe someone else money.

q.  The longer a drug trafficker is involved in continuous illegal drug trafficking, the more information about and fruits of drug trafficking are accumulated.  Drug traffickers safeguard the fruits and instrumentalities of their drug trafficking activities in safe areas such as their private residences, safe houses, stash houses and businesses.

r.  Drug traffickers often use the narcotics that they traffic and manufacture and/or other narcotics, and it is not unusual to find personal use quantities of narcotics and paraphernalia consistent with the use of these substances on their persons and on their property.

32.  On or about June 8, 2023, agents received information from a non-law enforcement individual who provided accurate information about law enforcement sensitive information pertaining to the imminent arrest of DIXON, and other members of the DIXON DTO.  The information relayed by this individual was accurate.  The individual claimed to have received the information from a non-law enforcement source, indicating that highly sensitive law enforcement information has been leaked to individuals who could potentially provide that information to the targets of this investigation.  Such a leak poses a significant risk to law

enforcement safety while attempting to execute arrest and search warrants during the daytime. The charged members of this DTO are convicted felons, with histories involving drugs and/or weapons. A number of these DTO members have prior federal convictions. Thus, it is highly likely that members of this DTO are aware of standard federal law enforcement tactics and procedures used during the execution of search and arrest warrants and that members of this DTO have shared this information among themselves.

## CONCLUSION

33.     Wire intercepts confirm that DIXON supplies UC-3 with illegal controlled substances for further distribution. Wire intercepts, agents' observations, and GPS Location Data from DIXON's phone, all establish that UC-3 resides at the SUBJECT RESIDENCE and often conducts his drug trafficking activities at or near the SUBJECT RESIDENCE.

34.     Based on the foregoing facts and information, there is probable cause to believe that at the SUBJECT RESIDENCE, more fully described in Attachment A, incorporated by reference herein, there will be evidence, fruits and instrumentalities, as specifically described in Attachment B, incorporated by reference herein, of UC-2's and UC-3's participation in DIXON's on-going, long term drug trafficking operation, in violation of 21 U.S.C. §§ 841 and 846.

Further your affiant sayeth not.

Task Force Officer Stephen Lamar
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this  22nd  day of June, 2023, in Richmond, Virginia.

_____/s A A A_____

The Honorable Summer L. Speight
United States Magistrate Judge

## ATTACHMENT A

1.    *Property to be searched*

The property to be searched is the residence located at 10263 Faith Drive Apartment #2 King George County, Virginia 22485 . The residence is described as a single-story apartment complex with one main corridor through the middle and three apartments on each side of the corridor. Apartment #2 is the north western most part of the apartment building. The front door is located within the corridor marked with a number "2." The rear door is described as a sliding glass door under located on the back porch.





## ATTACHMENT B

Description of property to be seized

a. Indicia of occupancy, residency, control and/or ownership of the premises and things to be searched described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, vehicle registrations, business records, loan applications, bank records and other financial documents relating to ownership or occupancy, canceled envelopes and keys, and photographs;

b. Drug paraphernalia, including materials for cutting, weighing, and packaging controlled substances, including hydraulic presses, press plates, and vacuum sealers;

c. Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video recordings, digital images, personal digital assistants ("PDAs" or tablets), personal notes and other items reflecting names, addresses, telephone numbers, communications, and/or illegal activities of co-conspirators in narcotics trafficking activities in paper and digital format;

d. Narcotics and money ledgers, narcotics distribution and customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed in paper and digital format;

e. Electronic communication devices, cellular telephones, tablets, gaming consoles, two-way radios, onboard computer messaging systems, GPS navigation devices and electronic logging devices ("ELD") and other communication and navigation devices which evidence participation in illegal drug trafficking in violation of Title 21, United States Code, Section 841;

f. United States and foreign currency derived from the sale of controlled substances in violation of Title 21, United States Code, Section 841;

g. Bank account records, wire transfer records, digital money transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, loan documents, money wrappers, money containers, income tax returns, financial transfers, which reflect payment for or proceeds of the sale of controlled substances in violation of Title 21, United States Code, Section 841 in paper and digital format;

h.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashier's checks, crypto currency, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money; money counting machines, money wrappers and bags used to carry controlled substances;

i.  Records, documents and deeds, in paper and digital format, reflecting the purchase or lease of real estate, vehicles, businesses, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

j.  Records, items, and documents reflecting travel involving narcotics trafficking, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, GPS data, written directions to locations, hours of service/records of duty status from CDL logbook/ELD;

k.  Any and all electronically stored data on computers, hard-drives, zip-drives, or portable storage devices described above in categories (a) through (j), including any and all electronic devices and/or computer hardware equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, including but not limited to, any data-processing devices (such as central processing units, memory typewriters); internal and peripheral storage devices (such as fixed disks, external hard disk, removable disk drives, CDs, DVDRs, memory cards/sticks, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks); computer software consisting of digital information which can be interpreted by computer and any of its related components to direct the way they work including, but not limited to, software stored in electronic, magnetic, optical, or other digital form, which commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communication programs; computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items; computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data consisting of (but not limited to) hardware, software, or other programming code, encryption devices, chips, and circuit boards.

l.  Safes, lockboxes and other portable locked containers.